**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**UNITED STATES OF AMERICA**,

                Plaintiff,

**v.**

**GREGORY KEITH CLINTON,**

                Defendant.

**CRIMINAL ACTION NO.: 3:17-CR-5 (GROH)**

## <u>REPORT AND RECOMMENDATION</u>

### I.    <u>INTRODUCTION</u>

This case arises from Gregory Keith Clinton's ("Clinton") Motion to Suppress and Supplemental Motion to Suppress evidence found during a traffic stop, which lasted less than twenty-three minutes, and subsequent search of his home. Clinton argues that (1) the traffic stop was unreasonably prolonged or unnecessarily delayed, and (2) he was not read his <u>Miranda</u> rights before giving statements that led to a subsequent search of his home. For the reasons that follow, the undersigned recommends that Clinton's motion to suppress be denied and his supplemental motion to suppress be granted in part and denied in part.

## II.    BACKGROUND

### A. Facts[1]

### 1.  The Traffic Stop

On July 3, 2016, Deputy Corey C. Welcome and Deputy David Ritchie of the Berkeley County Sheriff's Department were driving eastbound on Route 9 in Berkeley County, West Virginia. At the time, Deputy Ritchie was a new officer in training, and Deputy Welcome was assigned to train him. As they were driving eastbound, Deputy Welcome observed a gold Chevy Tahoe driving westbound on Route 9 that overtook (i.e., passed) two vehicles and appeared to be traveling over the posted speed limit. Knowing the speed limit was 45 mph, Deputy Welcome engaged his car's mounted radar, which recorded the Tahoe traveling at 60 mph. As the Tahoe (driving westbound) passed Deputy Welcome's patrol vehicle (driving eastbound), Deputy Welcome saw that the driver, later identified as Clinton, was not wearing his seatbelt.

Because Deputy Welcome saw the Tahoe traveling 15 mph over the speed limit and the driver was not wearing his seatbelt, Deputy Welcome decided to initiate a traffic stop. To do so, Deputy Welcome turned his patrol vehicle around and soon caught up with the Tahoe driving westbound on Route 9, where it was stopped at a red traffic light. After the light turned green, Deputy Welcome activated his working emergency lights and audible siren and initiated the traffic stop. It was approximately 11:18 a.m.

Once the vehicles were pulled over, the deputies approached the Tahoe on either side, with Deputy Ritchie approaching on the driver side and Deputy Welcome

---

[1] This section sets forth the undersigned's findings of fact based on the parties' motions, supporting, memoranda, and attached exhibits and the evidence and testimony presented during the suppression hearing on February 22, 2018. These facts are undisputed unless otherwise noted herein.

approaching on the passenger side.[2] As they approached, Deputy Welcome saw that the right passenger mirror was damaged.[3] At the driver-side window, Deputy Ritchie asked for Clinton's driver's license, registration, and proof of insurance. With that information in hand, Deputy Ritchie returned to the passenger side of Deputy Welcome's patrol vehicle and began the process for issuing a citation or warning. Although Deputy Ritchie was an officer in training, Deputy Welcome did not assist Deputy Ritchie with that process and left to his discretion whether to issue a citation, warning, or nothing at all. Because Deputy Welcome's patrol vehicle did not have a computer system, Deputy Ritchie had to relay his requests for information over the radio to Berkeley County Central Dispatch 911 ("Dispatch"), an entity separate and apart from the Sheriff's Department, and wait for a response.

At 11:19:11 a.m., Deputy Ritchie, who at that time was identified as officer number "157," radioed Dispatch to notify them of the traffic stop and a Computer Aided Dispatch ("CAD") Report was created. See Incident Detail Report, ECF No. 39-2 (redacted).[4] The only people with access to the CAD Report are personnel working at Dispatch; the officers on scene do not have access to the report, nor do they have the ability to enter information into the report. At 11:19:12 a.m., Deputy Ritchie radioed Dispatch and requested an automatic case number and a vehicle check. Dispatch

---

[2] At the suppression hearing, Clinton questioned which side of the vehicle Deputy Welcome approached, suggesting that he had testified inconsistently. That is not so. Having heard all the testimony, Deputy Welcome consistently testified that he had at all times approached Clinton's vehicle on the passenger side until Deputy Humphrey ultimately called for his assistance at the driver-side door.

[3] Although there is evidence to suggest that Deputy Welcome observed the damaged mirror before approaching Clinton's vehicle, there is no dispute that Deputy Welcome saw the damaged mirror as he approached the passenger-side door. More importantly, this inconsistency does not undermine the credibility of Deputy Welcomes' testimony.

[4] The CAD Report was also admitted into evidence during the suppression hearing as Defendant's Exhibit No. 2.

copied and pasted the results of the vehicle check into the CAD Report at 11:19:28 a.m., but that information was not immediately available to the officers because it has to be verbally communicated to the officers by Dispatch. There is no reliable way to know when Dispatch verbally relayed that information back to Deputy Ritchie, who was waiting on scene. At 11:22:16 a.m., Deputy Ritchie requested a person check. Dispatch copied and pasted the results of the person check into the CAD Report at 11:22:32 a.m. But again, there is no reliable way of knowing when Dispatched relayed those results back to Deputy Ritchie. At 11:24:29 a.m., Deputy Ritchie radioed Dispatch and requested a person check through the National Crime Information Center (more commonly known as "NCIC"). Dispatch copied and pasted those results into the CAD Report at 11:24:41 a.m. There is no record of when that information was verbally relayed to Deputy Ritchie. Once Dispatch relayed all the requested information, Deputy Ritchie then had all the information necessary to write a citation, warning, or nothing at all for the observed violations.[5] Although Deputy Ritchie started writing the citation at approximately 11:20 a.m., there is no dispute that he did not have all of the necessary information to complete a citation or a warning until, at least, 11:24:41 a.m.[6] Whenever

---

[5] At the suppression hearing, Clinton questioned Deputy Welcome's testimony that Deputy Ritchie wrote both the citation and the warning. Specifically, Clinton insisted that Deputy Welcome's testimony in Berkeley County Magistrate Court indicated that he had written the citation, warning, or both—not Deputy Ritchie. Having reviewed Deputy Welcome's testimony from magistrate court (admitted at the suppression hearing as Defendant's Exhibit No. 3, see Exhibit and Witness List, ECF No. 128), the undersigned readily concludes that Deputy Welcome's testimony was generally consistent. At worst, Deputy Welcome misspoke and quickly corrected himself. Defendant's Exhibit No. 3, ECF No. 128-4 at 4 ("[D]eputy Ritchie was sitting in the passenger seat, and he was still actively writing Mr. Clinton's citations for the speeding. And I wrote the defective- and he was still working on that.").

[6] This, of course, assumes that Dispatch already relayed the previously requested information back to Deputy Ritchie and immediately relayed the results of the NCIC person check to him too. Paula Wilson, a shift supervisor at Dispatch, however, confirmed that the time that search results are entered into the CAD Report does not accurately reflect when that information is relayed to officers on scene. She said that response times vary from day-to-day depending on the number of 911 calls, the amount of radio

that information was relayed to Deputy Ritchie, particularly the results of the NCIC person check, Deputy Ritchie and Deputy Welcome (who was wearing an ear piece while he spoke to Clinton and could hear information relayed from Dispatch) learned that Clinton was on federal probation for a drug related conviction.

While Deputy Ritchie began the process of writing a citation and warning, Deputy Welcome remained at the passenger side of Clinton's vehicle and made small talk. Initially, Deputy Welcome asked Clinton how his passenger-side mirror was damaged. [7] Clinton said that he had swerved off the road and hit a tree but never reported the accident. Then, Deputy Welcome asked Clinton where he was traveling that day. At first, Clinton said that he was on his way to Harpers Ferry, West Virginia, but this struck Deputy Welcome as odd because Clinton was driving westbound on Route 9, not eastbound towards Harpers Ferry. When Deputy Welcome brought this discrepancy to his attention, Clinton reversed course and said that he was heading to Gabe's first, a discount retailer less than a mile away (if he continued driving westbound). However, Clinton said that he didn't have any plans to go inside or purchase anything. What was striking to Deputy Welcome, at the time, was not that Clinton was going to Gabe's, but that Clinton specifically said that he was going to Gabe's with no intention of going inside or to purchase anything; Deputy Welcome knew that the Gabe's parking lot was

---

traffic with other officers on the road, etc. In short, Ms. Wilson said it is safe to say that relaying that information could take several minutes.

[7] Because the record is far from clear, it is impossible to know—with absolute certainty—the precise order of Deputy Welcome's questioning. Fortunately, however, the substance of Deputy Welcome's questions and, more importantly, the substance of Clinton's answers to those questions are not in dispute. Rather, Clinton only argues that the stop was unnecessarily delayed, a delay which was not supported by probable cause.

frequently used to traffic drugs and prostitutes and was a place where he himself had conducted numerous arrests.

With his curiosity heightened, Deputy Welcome asked about a plastic bag that he saw sitting between Clinton's leg and the center console. Clinton pulled out the bag, which turned out to be a bag of cough drops. After Clinton popped a few cough drops into his mouth, Deputy Welcome asked Clinton if he had any drugs in the car. In response, Clinton said that he did not have any marijuana in his vehicle. This too struck Deputy Welcome as particularly odd. Instead of saying yes or no, Clinton denied having a drug in the car that he was not asked about specifically. So, Deputy Welcome continued: "Do you have any other illegal drugs in the car? Do you have any heroin?" "No," Clinton replied. But then, when Deputy Welcome asked if there was any crack cocaine in the car, he observed an immediate change in Clinton's demeanor: He stared blankly and began "aggressively" chewing cough drops,[8] breathy heavily, and sweating. Deputy Welcome also saw Clinton's carotid artery visibly pulsating and his heart beating through his shirt.[9] Soon, Clinton began looking around and rummaging through his vehicle, pulling out and fumbling with various papers. When Deputy Welcome asked what Clinton was doing, he said, "Now, you've got me nervous, and you've got me wondering if there's anything in this vehicle." At some point during this conversation, Clinton offered two other pieces of information: that he liked to "party" with alcohol and had previously been convicted of a crime related to marijuana. When Deputy Welcome

---

[8] At the suppression hearing, Clinton disputed how someone could chew cough drops "aggressively," suggesting that it was not only an exaggeration, but also unbelievable. Here, however, the undersigned need not speculate one way or the other, because this fact is not material to the analysis below.

[9] At the suppression hearing, Clinton disputed how Deputy Welcome could see Clinton's heart beating through his white t-shirt. But again, the undersigned need not speculate one way or the other, because this fact is not material to the analysis below.

asked what kind of conviction—possession or distribution—Clinton said that they both "go hand in hand." Clinton, however, denied Deputy Welcome consent to search the vehicle.

Armed with this information but without consent to search Clinton's vehicle, Deputy Welcome, who at that time was identified as officer number "122," walked back towards his patrol vehicle and radioed Dispatch at 11:31:53 a.m. to request a K-9 unit. Although Deputy Ritchie was still busy writing Clinton's citation and warning, Deputy Welcome, as his training officer, interrupted him to explain the situation and what to do in the future during other traffic stops. Then, Deputy Welcome asked for his cell phone so he could reach out to K-9 handlers he had previously worked with to see if they were available to respond. In his experience, it is sometimes faster to request a K-9 directly, rather than going through Dispatch. After explaining the situation and the procedure to Deputy Ritchie and getting his cell phone, Deputy Welcome directed Deputy Ritchie to continue working on the citation and warning. Deputy Welcome then radioed Deputy Brandon Humphrey, who at that time was identified as officer number "147," to assist because he was nearby, and Deputy Welcome called a K-9 handler who he frequently works with to see if he was available to respond. By the time Deputy Humphrey arrived on scene at 11:35:03 a.m., Dispatch had received three negative K-9 responses from other local law enforcement agencies at 11:32:33 a.m., 11:33:24 a.m., and 11:34:52 a.m. Upon arrival, Deputy Welcome briefed Deputy Humphrey on the situation and asked him to watch Clinton because Deputy Welcome thought Clinton had drugs in the vehicle but couldn't tell what Clinton was holding in his hand. Specifically, Deputy

7

Welcome said he thought Clinton was holding something in his right hand, clenched between his pinky and ring fingers and his palm, leaving his other fingers extended.

After being briefed by Deputy Welcome, Deputy Humphrey approached the passenger-side door of Clinton's vehicle to watch him as instructed. There, Deputy Humphrey immediately sensed that Clinton was not only nervous, but also did not appreciate Deputy Humphrey's presence. But unlike his earlier interactions with Deputy Welcome, Clinton now offered Deputy Humphrey no small talk. Instead, Clinton kept fidgeting and continuously looked into his rearview and driver-side mirrors to see what Deputy Welcome was doing. Deputy Humphrey interpreted Clinton's curiosity with Deputy Welcome actions as consistent with criminal activity because suspects often monitor police to see if they (the suspect) have an opportunity to hide something.

Meanwhile, Deputy Ritchie continued writing Clinton's citation and warning, and Deputy Welcome continued to reach out to K-9 handlers using his cell phone. The first K-9 handler Deputy Welcome called didn't answer but soon responded via text. The handler said he couldn't assist because he was in church but suggested that Deputy Welcome call another K-9 handler who, the first handler thought, was on duty. The first handler also said that he would assist, if Deputy Welcome didn't have any success reaching out to other handlers. Taking his advice, Deputy Welcome started contacting the second K-9 handler that was possibly on duty. But before Deputy Welcome could get in touch with him, Deputy Humphrey called for help.

As Deputy Humphrey continued to watch Clinton, Deputy Humphrey noticed that Clinton kept moving his hands. Perceiving the movement as a possible threat to officer safety, Deputy Humphrey repeatedly instructed Clinton to keep his hands on his lap.

Ignoring those instructions, Clinton kept moving his hands and finally rested his left arm on the driver-side door with his hand out the window. Then, with Clinton's hand still in view, Deputy Humphrey saw Clinton manipulating his hand and dumping an off-white substance out of the window. Without hesitation, Deputy Humphrey immediately called for assistance from Deputy Welcome and rushed around the front of Clinton's vehicle to the driver-side door to secure his arm. At that time, Deputy Ritchie, who was still seated on the passenger side of the patrol vehicle, had completed writing Clinton's citation for not wearing his seatbelt but was still actively writing his warning for speeding. When Deputy Ritchie heard the call for assistance, he saw Deputy Welcome run past him and in front of the patrol vehicle toward Clinton's driver-side door. Deputy Ritchie immediately set his ticket book aside and rushed to assist his fellow officers.

### 2.  The Arrest and Subsequent Detention

When the deputies arrived, Deputy Humphrey secured Clinton's left arm and found a glass "tooter" in his hand. A tooter is a glass vile with a plastic top that is often used to conveniently store and snort cocaine. Although the tooter in Clinton's hand was now empty—its contents dumped onto the asphalt below—it still contained a white residue. Then, Deputy Welcome and Deputy Ritchie removed Clinton from his vehicle and placed him under arrest. Meanwhile, Deputy Humphrey put on plastic gloves and tried to recover as much of the dumped substance as possible. Based on his experience, it appeared to be crack cocaine because it was a rock-like substance that was broken into smaller pieces. As Deputy Welcome guided Clinton back to the patrol vehicle, Deputy Welcome said to Clinton, "I knew you had drugs in the vehicle; we got

you now!" In response, Clinton said, "What did you expect? I'm a convicted felon; I have five years over my head."

With Clinton secured, Deputy Ritchie radioed Dispatch at 11:42:28 a.m. to inform them that Clinton had dumped drugs out of the window while Deputy Welcome searched for a K-9 and Deputy Ritchie was writing Clinton's warning. The deputies, then, proceeded to search Clinton's person and vehicle. There, they found large sums of money in various locations and denominations, two ripped plastic baggies, and one clear plastic baggy containing a white, powdery rock substance that was tied off. The substance field tested positive for cocaine base, the evidence was documented, and Deputies Welcome and Ritchie transported Clinton back to the station for processing. Meanwhile, Deputy Humphrey stayed on scene until Clinton's vehicle was towed away.

At the station, Deputy Welcome and Deputy Ritchie processed Clinton. There, Clinton was finally given the completed citation and warning. At some point during processing, Clinton informed the deputies that his stomach was upset because of the stress or nerves from the day's event. Although his upset stomach led to one or two bowel movements, Clinton appeared to be in good health. After being placed into a holding cell, Clinton eventually expressed willingness to speak voluntarily to law enforcement. But when Deputies Welcome and Ritchie transported Clinton to an interview room and provided him with a Miranda waiver to execute, Clinton struck a line through the document, indicating that he was no longer willing to cooperate. Because Clinton struck a line through the waiver, Deputy Welcome began to transport Clinton back to his holding cell. This realization, however, prompted Clinton to again express his willingness to speak to the deputies voluntarily. Deputy Welcome then read Clinton

his <u>Miranda</u> rights,[10] Clinton executed a new written waiver of said rights, and Clinton gave a statement to Deputies Welcome and Ritchie. Specifically, Clinton said that there were more drugs and two firearms at his residence.

### 3.  The Search Warrant and Other Relevant Information

Deputy Welcome relayed that information to another officer who applied for a warrant to search Clinton's residence. That search warrant was executed by a number of deputies, including Deputies Welcome and Humphrey. There, they found two firearms, drugs, drug paraphernalia, and weighing and packing materials. Despite assisting with the search, Deputy Humphrey could not later recall whether additional drugs were found at Clinton's residence. He was, however, sure that two firearms were recovered.

After the search was completed, Deputy Welcome began completing all of the necessary paperwork. Until that paperwork was completed, he kept it at the corner of his desk—right above his trash can—with Clinton's <u>Miranda</u> waiver sitting on top. To date, the Berkeley County Sheriff's Department has not been able to locate the missing <u>Miranda</u> waiver. In addition, the Sheriff's Department has not been able to recover the audio-video recordings of Clinton's July 3, 2016 traffic stop or interview. The former was unrecoverable because Deputy Welcome's car was operating with a faulty hard drive, and the latter was unrecoverable because audio-video recordings of interviews are overwritten if there is no request to produce them within six months.[11]

---

[10] As set forth in <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966), every suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." These warnings have become colloquially known as "<u>Miranda</u> rights." <u>Dickerson v. United States</u>, 530 U.S. 428, 435 (2000).

[11] <u>See</u> <u>infra</u> note 17.

### B. Clinton's Motion to Suppress and Supplemental Motion to Suppress

In his motion to suppress, Clinton argues that "Deputy Ritchie or one or more law enforcement officers either purposely or improperly extended the traffic stop, or did not diligently pursue the mission of the stop, thereby enabling Deputy Welcome to conduct an investigation of [Clinton] unrelated to the mission of the stop." Def.'s Mot. to Suppress, ECF No. 39 at 5. Because the officers extended the stop, or did not diligently pursue the stop's mission, Clinton argues that his seizure, which "lasted well beyond the time reasonably necessary to issue a warning or ticket . . . for speeding and not wearing a seatbelt," was unlawful and any resulting statements or evidence should be suppressed as fruit of an unconstitutional traffic stop. Id.

In addition, Clinton argues that he was never read his Miranda rights—evidenced by the lack of any written waiver of said rights—and, therefore, any firearms found as a result of his unwarned statements should, too, be excluded as fruit of the poisonous tree. Id. at 6 n.1. In his supplemental motion to suppress, Clinton further argues that all evidence (including drugs, drug paraphernalia, and the like) found as a result of his unwarned statements should be excluded as fruit of the poisonous tree, not just the firearms and statements related to said firearms, as argued in his earlier motion. Def.'s Supp. Mot. to Suppress, ECF No. 47 at 1–2.

The Government's response is two-fold: First, it argues that "the officers did not prolong the stop beyond the time reasonably required to issue Clinton with the ticket and warning." Resp. in Opp. to Mot. to Suppress, ECF No. 54 at 1. Second, even if they did, the Government argues that any extension beyond the stop's original purpose was supported by "'reasonable suspicion' that Clinton was engaged in illegal activity . . . ." Id.

12

at 2.

The undersigned addresses each argument, in turn, below.

### III.   DISCUSSION

#### A.  Legal Standard

Although the burden of proof is generally on the party moving to suppress the evidence, see United States v. Hunter, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014) (citing United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981)), the United States bears the burden of proving the admissibility of the challenged evidence by a preponderance of the evidence, United States v. Wilkerson, No. 2:16-cr-00218, 2017 WL 5616364, at *3 (S.D. W. Va. Nov. 21, 2017) (citing Hunter, 63 F. Supp. 3d at 619; United States v. Matlock, 415 U.S. 164, 177 n. 14 (1974)). "During a pretrial hearing on a motion to suppress, 'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" Davis, 2017 WL 3097528, at *3 (quoting United States v. Hunter, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014)).

#### B.  The Traffic Stop

Clinton argues that officers "purposefully and improperly extended the traffic stop, or did not diligently pursue the mission of the stop, thereby enabling Deputy Welcome to conduct an investigation . . . unrelated to the mission of the stop." ECF No. 39 at 5. In support, Clinton directs the Court's attention to what has been described as a CAD Report. See Incident Detail Report, ECF No. 39-2. That document, Clinton argues, sets forth an accurate timeline of the traffic stop, from start to finish, and evidences the unreasonable delay. ECF No. 39 at 4–5. Specifically, Clinton argues that the CAD

Report shows that someone read various comments, clicked various buttons, or reviewed the report numerous times. Id. Yet after twenty-three minutes of reading and clicking, Deputy Ritchie still had not issued a ticket or warning. Id. at 5. Because the stop was prolonged beyond the time necessary to complete the stop's mission, Clinton argues that all statements and evidence found as a result should be suppressed as fruit of an unconstitutional traffic stop. See generally ECF Nos. 39, 47; see also Wong Sun v. United States, 371 U.S. 471 (1963) (establishing the exclusionary rule better known as the "fruit of the poisonous tree" doctrine).

The Fourth Amendment protects "[t]he right of people to be secure in their persons . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809–10 (1996) (citations omitted). Therefore, "[a]n automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Id. at 810. "Because a traffic stop is more akin to an investigative detention than a custodial arrest, [courts must] analyze the constitutionality of such a stop under the two-prong standard enunciated in Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968)." United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015); see also Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) ("[A] routine traffic stop is 'more analogous to a so-called "Terry stop" ' . . . than to a formal arrest.'" (citations omitted)). The Terry standard requires the undersigned to determine: (1) whether the reason for the traffic stop was justified at its inception; and (2) whether the officers'

14

"actions during the seizure were 'reasonably related in scope' to the basis for the traffic stop." Id. (citing United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992)); see also United States v. Vaughn, 700 F.3d 705, 709 (4th Cir. 2012) (citing same).

"Like a Terry stop, the tolerable duration of police inquires in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . ." Rodriguez, 135 S. Ct. at 1614 (citations omitted). "A seizure justified only by a police-observed traffic violation, therefore, 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." Rodriguez, 135 S. Ct. at 1612 (cleaned up) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. (citing United States v. Hill, 849 F.3d 195, 199 (4th Cir. 2017) [hereinafter Hill I] ("A routine traffic stop becomes an unreasonable seizure when law enforcement impermissibly exceeds the stop's scope or duration." (citations omitted)); see also United States v. Hill, 852 F.3d 377, 383 (4th Cir. 2017) [hereinafter Hill II] ("Moreover, the holding in Rodriguez does not render unlawful a traffic stop in which there are brief periods unaccounted for, as long as the stop was not prolonged for purposes beyond the mission of the stop, and the officers executed their tasks with reasonable diligence.")

Here, there is no doubt that Clinton's traffic stop was a non-consensual investigative detention that is subject to the two-prong Terry standard. But because Clinton concedes that the traffic stop at issue here was lawful at its inception, ECF No.39 at 6, the undersigned need only address the second prong of the Terry analysis: Whether the officers' "actions during the seizure were 'reasonably related in scope' to

15

the basis for the traffic stop." <u>Williams</u>, 808 F.3d at 245 (citation omitted). If the officers' action were reasonably related in scope, then the undersigned must determine whether the traffic stop was "'prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." <u>Rodriguez</u>, 135 S. Ct. at 1612 (citation omitted).

### 1. Deputy Ritchie's Actions Were Reasonably Related in Scope to the Basis for the Traffic Stop And Deputy Welcome's Unrelated Actions Did Not Lengthen Clinton's Roadside Detention

Deputy Welcome initiated a traffic stop because Clinton was driving above the posted speed limit and not wearing his seatbelt. Thus, the "mission" of the traffic stop was to issue Clinton a citation or warning for speeding and not wearing his seatbelt.

"Ordinary tasks incident to a traffic stop include 'inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants.'" <u>United States v. Bowman</u>, ___ F.3d ___, 2018 WL 1093942, at *5 (4th Cir. Mar. 1, 2018) (quoting <u>Hill II</u>, 852 F.3d at 382).

Here, Deputy Ritchie did nothing but the expected. Immediately after Deputy Welcome initiated the traffic stop, Deputy Ritchie approached the driver-side door and asked Clinton for his license, registration, and proof of insurance. With that information in hand, Deputy Ritchie returned to the patrol vehicle where he radioed Dispatch and requested one vehicle check and two person checks, the latter being run through NCIC. These searches enabled Deputy Ritchie to determine whether Clinton's vehicle was being "operated safely and responsibly," <u>Rodriguez</u>, 135 S. Ct. at 1615, and whether Clinton was subject to any outstanding warrants, <u>see Hill II</u>, 852 F.3d at 383. More

16

importantly, Deputy Ritchie's actions here are no different than other ordinary tasks previously approved by the Fourth Circuit. See, e.g., id. (declining to find unreasonable an officer's decision to run searches through the DMV, NCIC, and "PISTOL" databases because "the Fourth Amendment 'does not require that the officer employ the least intrusive means conceivable' in effectuating a traffic stop" (emphasis in original)). Accordingly, the undersigned readily concludes that Deputy Ritchie's actions were reasonably related in scope to the circumstances that justified the stop.

At the suppression hearing, Clinton also seemingly argued that Deputy Welcome's questioning was impermissible because it was unrelated in scope to the basis for the stop. Assuming Clinton did not waive the argument by not including it in his motion to suppress or supplemental motion to suppress, the argument is nevertheless without merit. "While diligently pursuing the purpose of a traffic stop, officers also may engage in other investigative techniques unrelated to the underlying traffic infraction or the safety of the officers." Hill II, 852 F.3d at 382 (emphasis added) (citations omitted). "Such unrelated activity is permitted under the Fourth Amendment only as long as that activity does not prolong the roadside detention for the traffic infraction." Id. (citation omitted); Bowman, ___ F.3d at ___, 2018 WL 1093942, at *5 ("The Fourth Amendment permits an officer to conduct an investigation unrelated to the reasons for the traffic stop as long as it does not lengthen the roadside detention." (cleaned up)). Here, Deputy Welcome asked Clinton a number of unrelated questions but did so without extending the length of the stop, because while Deputy Welcome was asking questions, Deputy Ritchie was diligently pursuing the stop's mission by requesting the ordinary checks and writing a citation and warning. And Deputy Welcome's attempt to secure a K-9 handler

17

is no different. See Hill II, 852 F.3d at 384; Rodriguez, 135 S. Ct. at 1615–16. While Deputy Welcome radioed dispatch and used his cellphone to request a K-9 handler to respond, Deputy Ritchie continued to diligently pursue the mission of the stop. See Hill II, 852 F.3d at 384 (concluding that officer's "decision to place a call requesting the K-9 unit did not extend the time period of the stop").

Deputy Welcome's actions here are also distinguishable from those at issue in United States v. Digiovanni, 650 F.3d 498 (4th Cir. 2011), abrogated on other grounds by Rodriguez, 135 S. Ct. 1609. In Digiovanni, the Fourth Circuit concluded that an officer "failed to diligently pursue the purpose of the stop" because he "embarked on a sustained course of investigation into the presence of drugs in the car that constituted the bulk of the encounter between" him and the suspect. 650 F.3d at 509. But there, the officer who conducted the stop was not accompanied by another officer. Without another officer to assist him, the officer in Digiovanni effectively abandoned the mission of issuing a citation by embarking on an unrelated investigation. Indeed, the officer there did not even run the suspect's driver's license, let alone begin writing a citation. Critically, here, Deputy Welcome's unrelated questioning did not come at the expense of abandoning the mission of Clinton's stop. Throughout Deputy Welcome's interactions with Clinton, Deputy Ritchie was diligently pursuing the stop's mission of issuing a citation and warning.

In short, Deputy Ritchie's actions were reasonably related in scope to the basis for the traffic stop, and Deputy Welcome's actions, though unrelated in scope, did not lengthen Clinton's roadside detention. Because Deputy Ritchie's actions were

reasonably related in scope, the undersigned must determine whether the traffic stop

was prolonged beyond the time necessary to complete its mission.

### 2. The Officers Did Not Prolong the Traffic Stop Beyond the Time Reasonably Necessary to Complete its Mission[12]

Clinton argues that Deputy Welcome, Deputy Ritchie, or someone else

prolonged the traffic stop beyond the time necessary to complete its mission of issuing a

citation or warning. See generally ECF Nos. 39, 47. Specifically, Clinton argues that it

should not have taken Deputy Ritchie twenty-three minutes to issue a citation or a

warning. In support, Clinton directs the Court's attention to the CAD report, which shows

that entries were repeatedly read, reviewed, and saved. ECF No. 39 at 4–5.

First, the undersigned concludes, without hesitation, that Dispatch employees did

not prolong the traffic stop beyond the time necessary to complete its mission. As set

forth above, officers on scene do not have access to review or make entries into the

CAD Report. Therefore, all CAD entries were made by Dispatch employees. But the

repetitive reading, reviewing, and clicking, that Clinton complains of is easily explained:

At the suppression hearing, Paula Wilson credibly testified that entries in CAD Reports

are viewed numerous times because numerous dispatch employees will make CAD

entries and those entries must be reviewed by supervisors for accuracy. Each time a

Dispatch employee reviews a CAD entry, that action is recorded on the "back end" of

the CAD software. Here, there is simply no evidence to suggest that Dispatch prolonged

the stop beyond the time necessary to complete its mission. If anything, the CAD Report

evidences just the opposite. For example, each time Deputy Ritchie radioed Dispatch to

---

[12] Because the undersigned already concluded that Deputy Welcome did not prolong the traffic stop beyond the time reasonably required to effectuate its purpose, see supra III.B.1, the undersigned need not repeat it here.

run a vehicle or person check, Dispatch promptly created an entry reflecting that communication, ran the requested check, copied and pasted the results of the check into the CAD Report, and verbally relayed those results to back to Deputy Ritchie on scene within several minutes. Accordingly, the undersigned concludes that Dispatch did not prolong Clinton's roadside detention.

Second, the undersigned must determine whether Deputy Ritchie prolonged the traffic stop beyond the time reasonably necessary to complete its mission. See Rodriguez, 135 S. Ct. 1609. To do so, the undersigned must determine when Deputy Ritchie should have reasonably completed the citation and warning.[13] See id. at 1614 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." (citation omitted)). Here, the undersigned concludes that Deputy Ritchie could not have completed both the citation and warning before Clinton was seen dumping drugs.

At the time the traffic stop was conducted, Deputy Ritchie was a deputy in training with little experience writing citations and warnings. Because this traffic stop was only one of his first few stops as a member of the Sheriff's Department, it took Deputy Ritchie longer to write citations and warnings than a more experienced officer. Specifically, Deputy Ritchie credibly testified that it now takes him anywhere from eight to ten minutes to write a citation or warning, depending on when the requested information is received from Dispatch. In training, it took even longer. In Rodriguez,

---

[13] Because it is undisputed that Deputy Ritchie completed the citation but was still actively writing the warning when Clinton was seen dumping drugs, the relevant question is when Deputy Ritchie should have reasonably completed the citation and the warning.

20

Justice Thomas aptly noted that the majority's decision allowed for the constitutionality

of a traffic stop to turn on

> the characteristics of the individual officer conducting the
> stop: If a driver is stopped by a particularly efficient officer,
> then he will be entitled to be released from the traffic stop
> after a shorter period of time than a driver stopped by a less
> efficient officer. Similarly, if a driver is stopped by an officer
> with access to technology that can shorten a records check,
> then he will be entitled to be released from the stop after a
> shorter period of time than an individual stopped by an
> officer without access to such technology.

Rodriguez, 135 S. Ct. at 1618 (Thomas, J., dissenting). Clinton's traffic stop highlights

that stark reality. Deputy Ritchie not only was less efficient at writing citations and

warnings than a more seasoned officer, but also did not have access to technology that

would have shortened the period of time necessary to complete them.

Further, Deputy Ritchie did not receive any assistance communicating with

Dispatch or writing the citation and warning from his training officer, Deputy Welcome.

Deputy Welcome testified that he did not assist Deputy Ritchie with that process

because Deputy Ritchie would not always have someone to assist him while on patrol.

Instead, Deputy Welcome thought it best to let Deputy Ritchie handle the mission of the

stop on his own, a decision which certainly added to the time reasonably necessary for

him to complete the stop's mission. Also, in Hill II, the Fourth Circuit declined the

invitation to find unreasonable as a matter of law an officer's "decision to stand next to

the car during most of the stop, rather than . . . assist [his fellow officer] in completing

the database searches in the police cruiser." 852 F.3d at 383. Although there was no

obvious threat to officer safety here, like there was in Hill II, the undersigned declines

the same invitation. Given the inherent risks presented by even the most ordinary traffic

stops, the undersigned concludes that it is reasonable for "two officers to allocate duties at the scene of the traffic stop, so that one remained in the immediate proximity of the vehicle's occupant[] at all times . . . ." Id. at 384.

Furthermore, it is undisputed that Deputy Ritchie did not have all of the necessary information to complete the citation and warning until at least 11:24:41 a.m., the time Dispatch copied and pasted the results of the NCIC person check into the CAD Report. Because all of the witnesses at the suppression hearing credibly and consistently testified that relaying information from Dispatch to officers on scene could take as long as several minutes, the undersigned concludes that the necessary information was not verbally relayed to Deputy Ritchie at the same time that it was copied and pasted into the CAD Report. Accordingly, the necessary information was radioed to Deputy Ritchie after it was copied and pasted at 11:24:41 a.m. Given the testimony at the suppression hearing, a conservative estimate is that Deputy Ritchie had everything he needed to complete the citation and warning by 11:25:41 a.m. Assuming it only took him ten minutes to write a citation and ten minutes to write a warning,[14] Deputy Ritchie should have finished writing Clinton's citation and warning by 11:45:41 a.m. (ten minutes for each), almost three minutes after Deputy Ritchie radioed Dispatch to inform them that Clinton was seen dumping drugs.

That, however, assumes that Deputy Ritchie wrote the citation and warning without interruption. Here, Deputy Ritchie had no such luxury. Rather, Deputy Ritchie was interrupted when Deputy Welcome explained the circumstances of his interactions with Clinton, instructed Deputy Ritchie what to do during future traffic stops, and asked

---

[14] Although Deputy Ritchie testified that it took him longer than eight to ten minutes to complete a citation or warning as an officer in training, the undersigned uses ten minutes as a conservative estimate.

him for his cell phone so he could contact K-9 handlers. In addition, it is clear from the

all the testimony at the suppression hearing that Deputy Ritchie did not inform Dispatch

that Clinton was seen dumping drugs until after it already happened. In fact, all of the

evidence suggests that Deputy Ritchie did not radio Dispatch until after Clinton was

secured, removed from his vehicle, and arrested. For example, Deputy Ritchie

specifically testified that when he heard Deputy Humphrey call for assistance, Deputy

Ritchie saw Deputy Welcome rush by and Deputy Ritchie immediately set his ticket

book aside and went to his fellow officers' assistance. Therefore, Clinton was seen

dumping drugs sometime before 11:42:28 a.m., when Deputy Ritchie radioed that

information to Dispatch. Again, Deputy Ritchie could not have completed both the

citation and warning before Clinton was seen dumping drugs.

In sum, the undersigned concludes that the officers did not prolong the traffic

stop beyond the time reasonably necessary to effectuate its purpose.

### 3. Any Delay in Clinton's Traffic Stop Was Supported by Reasonable Suspicion

Even if Clinton's traffic stop was prolonged, the Government argues that the

prolonged seizure was supported by reasonable suspicion.[15] More specifically, the

Government argues that Deputy Welcome had reasonable suspicion to believe that

criminal activity was afoot when he decided to radio Dispatch for a K-9, thus any delay

that occurred after that time was justified. The undersigned agrees.

"[A]n officer cannot investigate a matter outside the scope of the initial stop

unless he receives the motorist's consent or develops reasonable, articulable suspicion

---

[15] For example, one could conclude that Deputy Welcome's decision to train Deputy Ritchie about what to do during future stops was unrelated to the stop's mission and impermissibly extended the stop, even if only for a *de minimis* period of time, in violation of <u>Rodriguez</u>, 135 S. Ct. at 1615–16.

of ongoing criminal activity." <u>United States v. Palmer</u>, 820 F.3d 640, 649–50 (4th Cir.

2016) (citation omitted). "Reasonable suspicion is a 'commonsense, nontechnical'

standard that relies on the judgment of experienced law enforcement officers, 'not legal

technicians.'" <u>Id.</u> at 650 (quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 695 (1996)).

"[T]he articulated factors supporting reasonable suspicion during a traffic stop 'must in

their totality serve to eliminate a substantial portion of innocent travelers,' and also

demonstrate a connection to criminal activity." <u>Id.</u> (quoting <u>United States v. Williams</u>,

808 F.3d 238, 246 (4th Cir. 2015)). However, "[t]he possibility that some of the facts

might be innocently explained does not suffice to defeat a finding of reasonable

suspicion if 'the relevant facts . . . in their totality serve to eliminate a substantial portion

of innocent travelers.'" <u>United States v. Nestor</u>, No. 1:17CR43, 2018 WL 447618, at *7

(N.D. W. Va. Jan. 17, 2018) (quoting <u>Williams</u>, 808 F.3d at 246).

Here, the relevant facts surrounding the traffic stop—in their totality—eliminate a

substantial portion of innocent travelers. First, Clinton's interactions with Deputy

Welcome started with inconsistencies. When asked where he was going, Clinton said

he was heading to Harpers Ferry, but he was driving the wrong way. Instead of driving

eastbound on Route 9 towards Harpers Ferry, Clinton was driving westbound. When

Deputy Welcome brought this inconsistency to Clinton's attention, he immediately

reversed course and said that he was heading to Gabe's. Although going to Gabe's is

not uncommon for an innocent traveler, it is uncommon to go to Gabe's with no intention

of going inside or to purchase anything. Deputy Welcome found this suspicious based

on his first-hand knowledge and experience that the Gabe's parking lot was regularly

used to traffic drugs and prostitutes.

24

Second, when asked whether he had any drugs in the vehicle, Clinton gave an unusual answer: Instead of saying "no" like an innocent traveler seemingly would, he said "No, there's no marijuana in the vehicle." To Deputy Welcome, Clinton's answer created the possibility that other drugs may be in Clinton's vehicle. This possibility became even more apparent as Deputy Welcome continued to question Clinton. Although he denied having any heroin, Clinton's reaction to crack cocaine was markedly different: Instead of saying "no," Clinton became visibly nervous. He started staring blankly, sweating, and breathing heavily. In addition, Deputy Welcome saw Clinton's carotid artery was visibly pulsating. Then, Clinton started rummaging around his vehicle, and when asked what he was doing, he said "Now, you've got me nervous, and you've got me wondering if there's anything in this vehicle."

Third, Clinton offered two other unusual pieces of information: He said that he liked to "party" (albeit with alcohol) and had previously been convicted of a crime related to marijuana. When Deputy Welcome asked what kind of conviction—possession or distribution—Clinton said that they both "go hand in hand." Taken together, the undersigned is satisfied that all of these facts eliminate a substantial portion of innocent travelers.

To come to this conclusion, it is important to note that the totality of relevant facts present here are distinguishable from those at issue in Bowman. See 2018 WL 1093942, at *12 (finding no basis for reasonable suspicion). There, the officer also testified that he had seen both suspects exhibit various signs of nervousness that supported reasonable suspicion. Id. at 8–9. For example, the officer noticed that the driver's hands were shaking when he handed over his license and registration, and he

saw both suspects' carotid arteries pulsing. Id. The Fourth Circuit, however, emphasized the limited value of "mere nervousness" to determining reasonable suspicion. Id. at 8. In support, it explained that "it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity." Id. at 9 (cleaned up) (citations omitted). Instead, courts must look for "nervousness beyond the norm." Id. (citations omitted). There, the Fourth Circuit concluded that there was nothing of the sort. Id. Although the driver's hands were shaking when he handed over his license and registration, the officer critically conceded that the driver's "nervousness subsided and he appeared and sounded calm for the remainder of the traffic stop." Id. (citation omitted). In addition, the Fourth Circuit questioned the officer's ability to see carotid arteries pulsing because he had limited medical training. Id. But even if he did, the officer conceded that the elevated heart rate could have been caused by the energy drinks that were present at the time of the stop. Id.

Conversely, here, the signs of nervousness exhibited by Clinton were well beyond the norm. Unlike the driver in Bowman whose nervousness subsided as the traffic stop progressed, Clinton's signs of nervousness were not triggered by the traffic stop or, even, Deputy Welcome's presence; Clinton appeared cool, calm, and collected from the outset. Instead, Clinton's nerves were triggered only by a very specific question: Whether Clinton had any crack cocaine in the vehicle. Further, Bowman does not suggest that observing a pulsing carotid artery cannot, as a matter of law, serve as a basis for reasonable suspicion. See generally id. at 8–10; see also States v. Foreman, 369 F.3d 776, 784 (4th Cir. 2004) (finding reasonable suspicion based in part on an

26

officer's observation that the suspect's "carotid artery on his neck throbbing more noticeably than the thousands of people that [the officer] had stopped in the past"). Rather, it merely questions its veracity and utility when the officer doesn't have any significant medical training and there may be an innocent explanation. Here, Deputy Welcome did not observe Clinton's carotid artery pulsing until after Deputy Welcome asked if Clinton had any crack cocaine in the vehicle. And when he did, Deputy Welcome also saw that Clinton started sweating, breathing heavily, and staring blankly. There were no energy drinks in the car, nor was there any evidence to suggest that Clinton had some kind of medical condition that would have the same effect. In short, Clinton's nervousness did not subside over time; it only progressed and was triggered by a specific question.

Because the undersigned concludes that Clinton's traffic stop was constitutional—because the seizure either was not prolonged or was supported by reasonable suspicion—any alleged statements he later made regarding the presence of firearms or controlled substances at his residence are not excludable as fruit of the poisonous tree. But Clinton also argues that he was not read his Miranda rights, see ECF No. 39 at 6 n.1, and, therefore, any evidence found during the subsequent search of his home should be excluded as fruit of the poisonous tree. The undersigned addresses this argument, separately, below.

### C.  Statements Clinton Made to Police While in Custody

Clinton also argues that he was not read his Miranda rights and, therefore, his unwarned statements—and any evidence found as a result of said statements—should

be suppressed as fruit of the poisonous tree.[16] ECF No. 39 at 6 n.1; ECF No. 47 at 2;

see also Wong Sun, 371 U.S. 471 (establishing the Fourth Amendment exclusionary

rule better known as the "fruit of the poisonous tree" doctrine).

### 1. Statements Made Before Clinton Was Read His Miranda Rights Will Be Suppressed

"A person subjected to custodial interrogation is entitled to the procedural

safeguards prescribed by Miranda, and therefore, any statements a suspect makes

during custodial interrogation are inadmissible in the prosecution's case in chief unless

prior Miranda warnings have been given." United States v. Leshuk, 65 F.3d 1105, 1108

(4th Cir. 1995) (citations omitted). "A suspect is 'in custody' for Miranda purposes if the

suspect has been formally arrested or if he is questioned under circumstances in which

his freedom of action is curtailed 'of the degree associated with a formal arrest.'" Id.

(citation omitted).

It is undisputed that Clinton was under formal arrest after he was seen dumping a

substance from his vehicle. Although Clinton was not questioned immediately upon his

arrest, he was subjected to its functional equivalent. "Police actions are the functional

equivalent of interrogation if the police's comments or actions were reasonably likely to

result in an incriminating statement." John H. Blume & Emily C. Paavola, Is it

Admissible?, 21 S.C. Law. 28, 32 (Mar. 2010) (citing Rhode Island v. Innis, 446 U.S.

---

[16] Clinton also argues that he did not make any statements to the police. ECF No. 39 at 6 n.2. But if Clinton didn't make any statements, then the officers did not violate his constitutional rights by failing to read him his Miranda rights. Presumably, Clinton argues that he made no such statements to suggest that police obtained the warrant to search his home based on facts that were entirely fabricated. Id. at 6. But other than Clinton's one-sentence footnote, there is nothing in the record to suggest that that occurred. Even if it did, the undersigned readily concludes that the police would have inevitably discovered all of the physical evidence obtained from Clinton's home through a search warrant obtained based on the evidence discovered during the traffic stop. There, the officers found drugs, several small baggies, and large quantities of U.S. currency. That evidence, alone, would have provided officers a sufficient factual basis to obtain a search warrant for Clinton's residence.

291, 301 (1980) ("[T]he term 'interrogation' under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.")).

More specifically, after placing Clinton under arrest, Deputy Welcome said to him, "I knew you had drugs in the vehicle; we got you now!" Here, Deputy Welcome's statement and actions were the functional equivalent of an interrogation because it was reasonably likely to elicit an incriminating statement. Indeed, Clinton responded with just that: "What did you expect? I'm a convicted felon; I have five years over my head." Although Clinton was entitled to the safeguards established by <u>Miranda</u> when Deputy Welcome subjected him to the functional equivalent of an interrogation immediately after his arrest, Deputy Welcome did not read Clinton his <u>Miranda</u> rights until he later requested to speak with deputies voluntarily at the station. Because Deputy Welcome did not read Clinton his <u>Miranda</u> rights before subjecting him to the functional equivalent of an interrogation, Clinton's statement must be suppressed.

This analysis, however, does not address Clinton's argument that <u>all</u> statements and resulting physical evidence should be suppressed because he was never read his <u>Miranda</u> rights. The undersigned addresses this argument below.

### 2.  Statements Made and Evidence Found After Clinton Was Read His <u>Miranda</u> Rights Will Not Be Suppressed

As a threshold matter, the suppression of Clinton's statement above does not require suppression of all of Clinton's statements to police or the evidence found using those statements. <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 309–314 (1985). Although Deputy Welcome subjected Clinton to the functional equivalent of an interrogation,

Deputy Welcome did not do so with "deliberately coercive or improper tactics" to obtain the initial statement. Id. at 314 ("[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion."). Further, "[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." Id. Here, Clinton ultimately decided he wanted to speak with Deputies Welcome and Ritchie after he was processed at the station. As discussed in more detail below, Clinton was then read his rights and "made a rational and intelligent choice" to waive those rights. Id. Clinton's transfer and processing were thus intervening events that broke the causal connection between Clinton's unwarned statement and his later decision to cooperate. Because any connection between the two is attenuated at best, the undersigned concludes that suppression of Clinton's statement above does not taint the later decision of his own free will to waive his Miranda rights. Now, the undersigned will address whether Clinton knowingly and voluntarily waived those rights.

The statements Clinton later made to Deputies Welcome and Ritchie at the Sheriff's Department are inadmissible at trial unless the Government can establish, by a preponderance of the evidence, that he "'in fact knowingly and voluntarily waived Miranda rights' when making the statement[s]." Berghuis v. Thompkins, 560 U.S. 370, 382 (2010) (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979)); Colorado v. Connelly, 479 U.S. 157, 168 (1986) ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of

our Miranda doctrine, the State need prove waiver only by a preponderance of the evidence." (citations omitted)). A Defendant "who has received and understood the Miranda warnings, and has not invoked his Miranda rights, waives the right to remain silent by making . . . uncoerced statement[s] to the police." Berghuis, 560 U.S. at 388–89.

Here, the evidence shows that Clinton waived his Miranda rights. "There is no basis in this case to conclude that he did not understand his rights; and on these facts it follows that he chose not to invoke or rely on those rights when he did speak." Id. at 385. First, Clinton does not argue that he did not understand his rights, nor does he argue that he cannot read or understand English. "[F]rom this it follows that he knew what he gave up when he spoke." Id. (citation omitted). Further, Clinton received a written copy of the Miranda warnings, which Deputy Welcome read to him aloud. He was thus aware of his right to remain silent and his right to counsel before making any statements to Deputies Welcome and Ritchie. Second, Clinton did not invoke his right to remain silent and stop the questioning. Third, there is no evidence that Clinton's statements were coerced. Clinton does not claim or argue that Deputy Welcome or Deputy Ritchie threatened or injured him during the questioning or that he was fearful in any way. Nor does Clinton suggest that he was deprived of sleep or food. Understanding his rights in full, he waived his right to remain silent by making voluntary statements to Deputies Welcome and Ritchie. See id. at 389. Although the Sheriff's Department cannot now produce the written waiver that Clinton executed, the officers were not required to obtain a written waiver of Clinton's Miranda rights in the first

place.[17] Id. ("The police . . . were not required to obtain a waiver of [defendant]'s right to remain silent before interrogating him."). Because Clinton was read his rights, understood his rights, and voluntarily waived his rights, his argument that his statements and any resulting evidence should be suppressed is without merit.

Even if Clinton was not read his Miranda rights, the Fourth Circuit has repeatedly held—and the Supreme Court has since confirmed—that failing to give a defendant Miranda warnings does not require the "suppression of the physical fruits of the suspect's unwarned but voluntary statements." United States v. Patane, 542 U.S. 630, 634 (2004); United States v. Sterling, 283 F.3d 216, 219 (4th Cir. 2002) ("[D]erivative evidence obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment is never 'fruit of the poisonous tree.'" (citation omitted)); see also Dickerson, 530 U.S. at 441 (noting that "unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment"); Elstad, 470 U.S. at 304 (warning litigants not "to obscure fundamental differences between the role of the Fourth Amendment exclusionary rule and the function of Miranda in guarding against the prosecutorial use of compelled statements as prohibited by the Fifth Amendment"). Here, Clinton does not argue, nor is there any

---

[17] At the suppression hearing, Clinton made much of the fact that the Sheriff's Department cannot produce the signed Miranda waiver that Clinton allegedly executed before questioning. Although there is simply no excuse for the Department's failure to preserve important documents, the fact that a written waiver cannot now be produced is of little important here: Police officers are plainly not required to obtain a written Miranda waiver before questioning someone in custody. Berghuis, 560 U.S. at 389.

On a related note, there is likewise no excuse for the Sheriff's Department to allow the operation of patrol vehicles that do not have functioning microphones, dash cams, or hard drives necessary to record that information. That said, there is no reason to admonish the Sheriff's Department for failing to preserve the July 3, 2016, video from the interview room where Clinton was questioned because Clinton did not file a subpoena commanding the Government to preserve and produce that video evidence until long after that video was overwritten in the Sheriff's Department's normal course of business. See Mot. for Subpoena Duces Tecum, ECF No. 48. Although it may be prudent to retain that video evidence beyond six months, that is a question of policy not before this Court.

evidence to suggest, that his statements to Deputy Welcome and Deputy Ritchie were coerced. See generally ECF Nos. 39, 47. Because Clinton's unwarned statements were voluntary, his argument that any physical evidence found as a result should be suppressed as fruit of the poisonous tree is without merit.[18] See Patane, 542 U.S. at 636 ("[T]he Miranda rule is a prophylactic employed to protect against violations of the Self–Incrimination Clause. The Self–Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement." (emphasis added)).

Accordingly, to the extent Clinton's motion to suppress and supplemental motion to suppress argue that all of his statements to police and any physical evidence found as a result of those statements should be suppressed as fruit of the poisonous tree because (1) the officers' actions were not reasonably related in scope to the basis for the traffic stop, (2) the officers prolonged the stop beyond the time necessary to effectuate the stop's mission, and (3) the officers did not read him his Miranda rights, those motions are denied. However, to the extent Clintons' supplemental motion to suppress argues that the statement he made to Officer Welcome immediately after his arrest should be suppressed because he was not read his Miranda rights, that motion is granted.

---

[18] Here, it is worth noting that if Clinton was not read his Miranda rights, the physical evidence found as a result of Clinton's unwarned but voluntary statements would be admissible at trial, see Patane, 542 U.S. 630, but the statements themselves would not be admissible under Miranda's exclusionary rule, see Elstad, 470 U.S. at 307 ("[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda."); United States v. Tyson, 360 F. Supp. 2d 798, 810 (E.D. Va. 2005) ("[W]hile the admission of 'unwarned statements into evidence at trial' constitutes a violation of the Self–Incrimination Clause, the introduction of physical evidence obtained as a result of voluntary statements does not."). This, however, does not offer Clinton the requested relief, because the undersigned concluded above that Clinton was read his rights, understood his rights, and voluntarily waived his rights.

## IV.   <u>RECOMMENDATION</u>

For the foregoing reasons, I **RECOMMEND** that Clinton's Motion [ECF No. 35] to Suppress (sealed), Clinton's Motion [ECF No. 39] to Suppress (unsealed), be **DENIED** and Clinton's Supplemental Motion [ECF No. 47] to Suppress be **GRANTED IN PART AND DENIED IN PART**. Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may file written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections with the Clerk of the Court. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. <u>See</u> 28 U.S.C. § 636(b)(1); <u>Wright v. Collins</u>, 766 F.2d 841, 845-48 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>see also</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 6th day of March, 2018.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE